## Rittenhouse Foundation, Inc., Appellant, *v.* Lloyd's London et al., Appellants.

Argued April 22, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Bernard Chanin,* with him *Donald K. Joseph, Bernard M. Borish,* and *Wolf, Block, Schorr & Solis-Cohen,* for defendants.

*Richardson Dilworth,* with him, *Jacob Kalish,* and *Dilworth, Paxson, Kalish, Kohn and Levy,* for plaintiff.

OPINION BY MR. JUSTICE POMEROY, June 1, 1971:

These appeals present the question of the extent, if any, of the liability of Lloyd's of London ("Lloyd's"), as insurers against loss by fire, to Rittenhouse Foundation, Inc. ("Rittenhouse"), whose building in Philadelphia was almost completely destroyed by fire in 1962. Two contracts of insurance had been issued, one in the face amount of $230,000, and the other in the amount of $68,500. After a nonjury trial, the court below held (1) that the larger policy was in force and effect on the date of the loss, and that the defendant insurers were liable thereon, and (2) that the smaller policy was not in force or effect on the date of the loss, and that the insurers were not liable thereon. A verdict was entered accordingly. Exceptions to findings and conclusions were filed by both parties, and in all material respects were dismissed by the court *en banc,* one judge dissenting. Both parties have appealed.

The facts, while involved, are not in dispute. In essential respects they are as follows: Rittenhouse was required under the terms of a purchase money mortgage covering the premises in question to maintain fire insurance in the aggregate face amount of $350,000. In partial discharge of this undertaking it purchased, effective June 27, 1961, $60,000 of insurance from Insurance Company of North America ("I.N.A."), $30,000 from Fidelity Phenix Insurance Company ("Fidelity-Phenix") and $30,000 from Newark Insurance Com-

pany ("Newark").[1] The balance of $230,000 was sought and obtained from underwriters at Lloyd's, the underwriting being evidenced by two "cover notes" issued by Stewart, Smith (Pennsylvania) Inc. ("Stewart, Smith"), brokers for Lloyd's.[2] Of paramount importance in the matter before us is the following language contained in both cover notes issued to Rittenhouse by Lloyd's: "Warranted same terms and conditions as and to follow the settlements of Insurance Company of North America,[3] and that said company has, at the time

---

[1] Before the present suit was commenced, both Fidelity Phenix Insurance Company and Newark Insurance Company settled the Rittenhouse claims against them for $20,000 each, or two-thirds of the face amounts of their respective policies. Accordingly, those companies are not parties to the present action.

[2] Although the total Lloyd's coverage was written as two separate contracts in the amounts of $199,700 and $30,210, respectively, and the individual underwriters were not identical on these two contracts, any distinction between the two is unnecessary for purposes of this decision.

For a general discussion of Lloyd's underwriting contracts see 2 Couch on Insurance 104, §§18:8-18:11 (1959) ; I Goldin, Law of Insurance in Pennsylvania, p. 2 (2d ed. 1946), where it is stated: "Lloyd's Coffee house was an inn kept by Edward Lloyd in London as early as 1688 and was a resort for mariners and those engaged in foreign trade. When a ship was to go to sea, it was the custom of the time for persons who desired insurance to pass among those present in the coffee house a slip giving the information as to the ship, crew, cargo, owner and the contemplated voyage. Any one interested and responsible would then write underneath the slip the amount for which he was willing to be liable to the insured, and would initial it. When the amount desired was obtained, the contract was complete. The name 'underwriters' was applied to insurers by reason of the methods thus employed. Also from this same source came the 'Lloyd's Lists,' which is the most important publication of the shipping world. Thus grew the largest insurance underwriting business in the world."

[3] The application of Rittenhouse to Lloyd's for this insurance indicated INA as the warranty company. Under the line so indicating was the following statement: "Lloyd's policies warrant same terms and conditions as and to follow the settlements of the insurance company named in the Lloyd's contract as warranty."

of any loss, and at the same gross rate, at least $60,000 (subject only to reduction by amount of any loss not reinstated) on the identical subject matter and risk, and in identically the same proportion on each separate part thereof. This policy is subject without notice to the same conditions, endorsements, assignments and alterations of rates as are, or may be assumed in the above-mentioned Company's Insurance upon which this policy is based and shall be deemed to include such risks of Lightning and/or Explosion as are included in that Insurance." For ease of reference these two paragraphs will be referred to as the "warranty clause".

Early in April, 1962, Rittenhouse's agent was advised that INA proposed to cancel its $60,000 policy. Since INA was Lloyd's "warranty company", the Rittenhouse agent promptly requested the broker, Stewart, Smith, to have Fidelity Phenix or Newark substituted as the warranty insurance company. At this time it was recognized in conversation between the broker and Rittenhouse's representative that INA's cancellation would immediately result in Lloyd's being off the risk if no substitute warranty company were secured. Lloyd's notified Stewart, Smith by cable that they wished to follow INA and therefore considered themselves off the risk as of April 5, 1962.[4] By formal written notice received by Rittenhouse on May 22, 1962, INA cancelled its policy, effective June 2, 1962. Lloyd's never gave written notice of cancellation to Rittenhouse, the only evidence of their intention being the above mentioned cable to the broker, Stewart, Smith; neither did they tender a return of premium.

---

[4] Apparently Lloyd's thought that the INA policy was being cancelled at that time rather than at the later date in June. This mistake in timing, assuming it was one, is of no consequence in the case at bar, since no loss occurred until after the INA cancellation date.

On July 7, 1962, occurred the fire which virtually destroyed the building in question.

Three days later, on July 10, 1962, two new cover notes totaling $68,500 were issued to Rittenhouse by Stewart, Smith on behalf of a second underwriting group at Lloyd's (hereinafter "Lloyd's Group II"). These cover notes stated the effective dates of coverage to be from April 5, 1962 to April 5, 1963 and designated Fidelity-Phenix (instead of INA) as the underlying warranty company, said company to have at least $30,000 coverage on the same subject matter and risk a the time of any loss. In all other respects the Lloyd's Group II cover notes were identical to those issued by the original Lloyd's group. On the face of these notes a space entitled "Previous No." was completed with the numbers of the cover notes issued by the original Lloyd's underwriters.

Rittenhouse contends that Lloyd's are bound because they never cancelled their insurance by any notice to Rittenhouse, that the cancellation of the INA policy did not automatically terminate Lloyd's commitment under their original cover notes, and that the issuance of the Lloyd's Group II policy (cover notes) was not an effective replacement of or substitution for their original undertaking. Lloyd's argument, in brief, is that its original cover notes were conditioned upon coverage of at least $60,000 by INA at the time of the loss, and that the cancellation of the INA policy prior to the loss automatically terminated Lloyd's liability on its original cover notes. We agree with Lloyd's position, and are therefore constrained to reverse.

The resolution of this dispute lies in the interpretation of the warranty clause in the Lloyd's cover notes; specifically the following language: "Warranted same terms and conditions as and to follow the settlements of INSURANCE COMPANY OF NORTH AMERICA, and that said company has at the time of any LOSS, . . . at least

$60,000 . . . on the same identical subject matter and risk. . . ." This mode of expression is undoubtedly telegraphic, but it is clear and unambiguous as far as the problem before us is concerned. The Lloyd's undertaking to the insured, not evidenced by any separate Lloyd's policy, was completely "geared into" co-insurance furnished by INA which the application to Lloyd's had designated as the "warranty company". That undertaking was to be on the same terms and conditions as the insurance issued by INA; settlement by Lloyd's of any claim was to be on the same basis as an INA settlement; and insurance issued by INA in the sum of at least $60,000 on the same subject matter and risk was required to be in existence at the time of any loss. The latter requirement was clearly a condition precedent to any liability on Lloyd's part; indeed the preceding two aspects of the Lloyd's insurance—those relating to terms and to settlement—were meaningless without the existing of the INA policy to which they refer. Since the condition precedent was admittedly not met, there could be no liability on the part of Lloyd's. The fact that it gave no independent notice of cancellation to Rittenhouse or its authorized agent is immaterial; it was automatically off the risk pursuant to the INA notice.[5]

The exact clause before us has not been previously construed in Pennsylvania, but it is neither new nor

---

[5] Rittenhouse relies, as did the court below, upon the case of *Internat. Salt v. Tennant*, 144 Ill. App. 30 (1908) for the proposition that independent written cancellation by Lloyd's was necessary in order for it to avoid liability. In *Tennant*, the warranty was that the underlying insurance company would have a policy in force on identical property "during the existence of this [Lloyd's] policy." The court found the quoted phrase to be ambiguous, and resolved the ambiguity in favor of the insured, holding that concurrent coverage as between Lloyd's and the lead company was required at some time, which did not have to be the time loss occurred. No such ambiguity is present in the case at bar.

uncommon, and has been before courts in other juris-
dictions. A case substantially the same as that at bar is
*National Factors, Inc. v. Holford,* 27 App. Div. 2d
377, 279 N.Y.S. 2d 470 (1967). There, as here, the lead
company cancelled; there, as here, Lloyd's terminated
its co-insurance, but no notice thereof was conveyed
to the insured. The court held that the Lloyd's policy
"became inoperative and void by its own terms". The
requirement of the continued maintenance of the under-
lying co-insurance was held to be "reasonable, consist-
ent, a condition precedent, not antagonistic to the
mortgage clause. . . ."

The enforceability of the clause was similarly upheld
in *Romanos v. Home Ins. Co.,* 355 Mass. 499, 246 N.E.
2d 173 (1969). In that case want of diligence in pre-
senting a claim of loss was held to bar recovery against
the primary carrier, and by the same token to relieve
Lloyd's of liability. Relying on the decisions in *Bar-
nard v. Faber,* 1 Q.B. 340 (1892) and *Beauchamp v.
Faber,* 14 T.L.R. 544 (1898), the court held that the
purpose of the warranty clause was to require concur-
rency of coverage, and that compliance with the war-
ranty was a condition precedent to recovery. See also
*Millers' Nat. Ins. Co. v. Wichita Flour Mills Co.,* 257
F. 2d 93, 104 (C.A. 10th, 1958) ; *Federal Intermediate
Credit Bank v. Globe and Rutgers Fire Ins. Co.,* 7 Fed.
Supp. 56 (D. Md., 1934).[6]

The holdings of these cases construing the so-called
warranty clause as being an expression of conditions

---

[6] As these cases indicate, the raison d'etre of the warranty
clause is that Lloyd's maintain no investigating or other servicing
facilities in this country and frequently rely altogether on domestic
carriers in whose judgment and business policies Lloyd's have con-
fidence. As the witness Bryson, Executive Vice President of
Stewart, Smith, testified in the case at bar, "The basic function
of the warranty clause has historically been simply to let the
underwriters in London know that somebody close to the situation
is essentially looking at the risk."

under which the insurer assumes the risk is in line with the usual interpretation of insurance contracts. As Williston observes, "[a] contract of insurance is normally a unilateral contract . . . most of the so-called warranties in insurance policies are not even promises in form, but are conditions. The use of the word 'warranty', therefore, in insurance law is a misnomer. It means a condition inserted on the face of the policy or a statement of fact, on the exact truth or performance of which, unless excused, the duty of immediate performance of the insurer's promise depends." 5 Williston on Contracts, §673 (3d ed., 1961).

This is not a case, as Rittenhouse argues, where the breach of a warranty as to existence of a future act or fact is of no materiality with respect to the risk insured against, and so will not be a bar to recovery. See, e.g., *Pugh v. Commonwealth Mutual Fire Ins. Co. of Pa.*, 195 F. 2d 83 (C.A. 3d, 1952);[7] *Diesinger v. American & Foreign Ins. Co.*, 138 F. 2d 91 (C.A. 3d, 1943); *Karp v. Fidelity-Phenix Fire Ins. Co.*, 134 Pa. Superior Ct. 514, 4 A. 2d 529 (1939).[8] Here the con-

---

[7] In *Pugh v. Commonwealth Mut. Fire Ins. Co.*, 195 F. 2d 83 (3d Cir. 1952), a warranty clause very similar to that presently before us was considered. There, however, the underlying warranty policy was in effect at the time of the loss. The court considered only whether that part of the warranty clause stipulating that the same terms and conditions would apply as were contained in the underlying co-insurance policy was satisfied where the underlying or warranty company was receiving a larger premium than the following insurer. It was held that this difference in terms did not materially affect the risks involved, and hence did not relieve the following carrier of liability.

[8] As examples of cases where non-fulfillment of a promise or fact *in futuro* has prevented insurance recovery because a condition present was not met, see *Blue Ridge Textile Co. v. Travelers Indemnity Co.*, 407 Pa. 463 181 A. 2d 295 (1962); *Price v. Century Indemnity Co.*, 333 Pa. 337, 5 A. 2d 130 (1939); *Mitchell v. Lycoming Mut. Ins. Co.*, 51 Pa. 402 (1865); *Lycoming Mut. Ins. Co. v.*

dition of existing INA co-insurance at the time of a loss was a *sine qua non* of the existence of any Lloyd's contract at the time of loss. We never reach the situation, dealt with in the cited cases, where the breach of a promissory warranty must be appraised in terms of materiality to the risk insured against.

We turn, in conclusion, to the second claim against Lloyd's put forward by Rittenhouse, the cover notes issued by Lloyd's Group II in the amount of $68,500, with Fidelity-Phenix as the lead or warranty carrier. As to these Lloyd's interposes no defense, and in effect concedes liability. Although dated and delivered July 10, 1962, three days after the fire, these cover notes were negotiated in May, 1962 and were stated to be for the period April 5, 1962 to April 5, 1963.[9] The undertaking was thus in force on the date of loss, and the only question is the extent of the liability.

The warranty clause on the Lloyd's Group II contracts, like the original ones, provided: "Warranted same terms and conditions as and to follow the settlements of" Fidelity-Phenix. The term "follow" is imprecise. Two of its meanings are given in Webster's Third International Dictionary (1965) as "to come after" or "to copy after". We accept these definitions as apposite to the clause under consideration. We thus find "to follow" to mean both to come after in time and to be of the same nature. See *Romanos v. Home Ins. Co., supra; Beauchamp v. Faber, supra.* Accordingly, since Fidelity-Phenix settled the claim against it for two-thirds the face value of its contract, Lloyd's Group II are liable for two-thirds of their $68,500

---

*Mitchell*, 48 Pa. 367 (1864) ; *Inland Ins. and Dep. Co. v. Stauffer*, 33 Pa. 397 (1859) ; *White Realty and Insurance Agency Co. v. Moreland*, 215 Pa. Superior Ct. 423, 428, 429, 259 A. 2d 461 (1969).

[9] April 5, 1962, was the date as of which Lloyd's had cancelled the original cover note following advice of INA'S intended cancellation.

undertaking. The question of actual cash value, reproduction cost and fair market value which were litigated as to Lloyd's INA note are not here important or relevant.

The judgments of the Court of Common Pleas are reversed. Judgment is here entered in favor of appellant Lloyd's in the appeal at No. 256, and judgment is here entered in favor of appellant Rittenhouse in the appeal at No. 365 in the sum of $45,666.66 with interest from the date of demand.

Mr. Justice COHEN took no part in the decision of this case.